IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  16-cv-01875-LTB

ARVALEE GERALD BECKER,

        Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

        Defendant.

_____

# ORDER

_____

Plaintiff Arvalee Becker appeals the final decision of the Acting Commissioner of Social Security ("SSA") denying his application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*  I have considered the parties' briefs (ECF Nos. 14–16) and the administrative record (ECF No. 11) ("AR").  Oral argument would not materially assist me in determining this appeal.

Mr. Becker argues the ALJ erred in assessing his RFC, conducted a faulty credibility assessment, and therefore wrongly determined he could return to his past relevant work.  As I describe below, I conclude that, to the extent the ALJ erred, any error was harmless.  I accordingly AFFIRM the Commissioner's final order.

# I. Background

## A.  Procedural History

This case has wended its way through various stages of the SSA application and appeals processes for about a decade. I summarize here the procedural history necessary to understanding the posture of this appeal.

Mr. Becker filed his application for disability insurance benefits and supplemental social security income with SSA in March 2007, alleging disability beginning July 13, 2005.  AR 202–13.  After SSA initially denied his claim, AR 136–41, Mr. Becker requested a hearing, AR 144.  The hearing took place on November 18, 2008, before an ALJ.  AR 690–727.  On August 18, 2009, the ALJ partially granted Mr. Becker's claim, concluding he was disabled within the meaning of the Social Security Act as of November 11, 2008, but not before then. AR 118–31.  Mr. Becker asked SSA's Appeals Council to review the ALJ's decision. AR 169.  The Appeals Council remanded the case to the ALJ on December 23, 2010, to further develop the record and evaluate the opinion evidence for the entire period at issue (beginning July 13, 2005).  AR 132–35.

On remand, the ALJ again issued a partially favorable decision, finding Mr. Becker disabled as of November 11, 2008, but not before then.  AR 10–31.  Mr. Becker appealed to SSA's Appeals Council, AR 8–9, and on March 8, 2012, the Appeals Council denied review.  AR 1–3.  Mr. Becker appealed to this Court, and Judge Martinez remanded the case, concluding the ALJ failed to consider all the relevant evidence when it found he was not disabled before November 11, 2008, and

ordering the ALJ to consider and discuss a Colorado State Vocational Rehabilitation Report. *Becker v. Astrue*, No. 12-cv-0786-WJM, 2013 WL 1413350, at *3 (D. Colo. Apr. 8, 2013); AR 674–85.

On remand, the ALJ failed to discuss the rehabilitation report despite the district court's directive, and yet again concluded that Mr. Becker was not disabled before November 11, 2008. AR 925–39. After Mr. Becker appealed to this Court, the Commissioner moved to remand the case in light of the ALJ's failure to follow this Court's mandate. AR 908–09. Judge Kane granted the Commissioner's motion. AR 913–15.

On remand, the ALJ concluded for the fourth time that Mr. Becker was not disabled before November 11, 2008. AR 854–70 (March 25, 2016 decision). The ALJ's March 2016 decision is the Commissioner's final decision in this case. *See* 20 C.F.R. § 404.984(d) (in cases on remand from the federal district court, "[i]f no exceptions are filed and the Appeals Council does not assume jurisdiction of your case, the decision of the administrative law judge becomes the final decision of the Commissioner after remand"). On July 21, 2016, Mr. Becker timely filed this appeal. (ECF No. 1.) I have jurisdiction pursuant to 42 U.S.C. § 405(g).

## B.    Facts

Before July 2005, Mr. Becker was treated by his family doctor, Sean O'Donnell, M.D, for occasional neck and back pain, high cholesterol, and gastroesophageal reflux disease (GERD) symptoms with prescription medication. *E.g.*, AR 353–60, 486. Mr. Becker was also treated for depression and

depression–related fatigue, AR 329, as well as carpel tunnel syndrome. AR 1035–42, 1047–72.

During the disability period (July 13, 2005 to November 10, 2008), Mr. Becker occasionally reported depression, insomnia, and back, neck, leg, and arm pain to Dr. O'Donnell. Imaging of his neck was essentially normal, AR 372–73, and imaging of his back showed normal vertebral height but some degenerative changes in his cervical spine, AR 375, 414; *see also* AR 1158 (MRI from 2003). Imaging of his knee showed mild joint effusion. AR 408–10.

In December 2006, Dr. O'Donnell completed a MED-9 form (a form used by the State of Colorado to determine medical eligibility for a state aid program) and concluded that Mr. Becker was "permanently disabled" since May 2003. AR 332–33. He listed Mr. Becker's diagnoses as tinnitus, degenerative joint disease, degenerative disc disease, bilateral carpel and cubital tunnel, and bilateral shoulder pain. AR 333. On November 11, 2008, Dr. O'Donnell completed a medical source statement. AR 482–85. He diagnosed Mr. Becker with chronic fatigue syndrome, GERD, "hyperlipid" and "HTN" (hypertension). AR 482. He also endorsed severe restrictions on walking, sitting, standing, lifting, and various postures. AR 483–84. In June 2011, Dr. O'Donnell "reaffirmed" his November 11, 2008 statement and clarified that he believed the disabling symptoms began in 1999. AR 576.

Dr. David Gibbons, D.O., examined Mr. Becker in July 2007 and prepared an agency–ordered report. AR 382–86. Dr. Gibbons observed that Mr. Becker exhibited "significant pain behaviors" during parts of the examination but did not

4

exhibit them during "deep palpation" or straight leg–raise tests. AR 384. Dr. Gibbons characterized the physical examination as "essentially normal" with the exception of a positive test for carpel tunnel and some limitation in side-bending and rotation to the left. *Id.* Dr. Gibbons opined that Mr. Becker had no visual, communicative, or environmental limitations, and no postural or reaching, handling, feeling, grasping, or fingering limitations. AR 385. He could not "corroborate (or refute)" any of Mr. Becker's self–reported sitting, standing, walking, lifting, or carrying limitations. *Id.*

Dr. Genest reviewed the medical evidence from the disability period and concluded that Mr. Becker had no severe physical disability restrictions. AR 610. Dr. Genest opined that Mr. Becker should not work on uneven ground or climb ladders or scaffolds unless he was wearing a knee brace. AR 611. He also opined that if he had more than "mild" degenerative disease in his spine, he may not want to lift anything over 50 pounds. *Id.*

Also in July 2007, Mr. Becker saw Terry Jones, M.D., a psychiatrist, for an agency–ordered consultative examination. AR 377. Dr. Jones concluded Mr. Becker was "mildly depressed," but cooperative, congenial, logical, and organized, with intact memory, good concentration, and normal abstract thinking. AR 379–80. He assessed chronic pain disorder with both psychological and medical factors and dysthymic disorder (a mild form of chronic depression). AR 380–81.

Gayle Frommelt, Ph.D., also assessed Mr. Becker's mental impairments, but her assessment was based only on her review of the medical records. AR 388–402.

Dr. Frommelt concluded Mr. Becker had mild impairment in maintaining concentration, persistence, and pace but had no severe mental impairments.  AR 399, 401.

## II.  Legal Standards

### A.    SSA's Five–Step Process for Determining Whether a Claimant Is "Disabled"

A claimant is "disabled" under Title II of the Social Security Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  SSA has established a five-step sequential evaluation process for determining whether a claimant is disabled and thus entitled to benefits.  20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity."  If he is, benefits are denied and the inquiry stops.  § 404.1520(b).  At step two, SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [his] physical or mental ability to do basic work activities."  § 404.1520(c).  If he does not, benefits are denied and the inquiry stops.  If he does, SSA moves on to step three, where it determines whether the claimant's impairment(s) "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively

disabled without regard to the claimant's age, education, or work experience. §
404.1520(d).  If not, SSA goes to step four.  At step four, SSA determines the
claimant's residual functional capacity ("RFC")—that is, what he is still able to do
despite his impairments, and asks whether the claimant can do any of his "past
relevant work" given that RFC.  § 404.1520(e).  If not, SSA goes to the fifth and
final step, where it has the burden of showing that the claimant's RFC allows him
to do other work in the national economy in view of his age, education, and work
experience.  § 404.1520(g).  At this step, SSA's "grid rules" may mandate a finding
of disabled or not disabled without further analysis based on the claimant's age,
education, and work experience.  20 C.F.R. Pt. 404, Subpt. P, App. 2.  In contrast
with step five, the claimant has "the burden of establishing a prima facie case of
disability at steps one through four."  *Doyal*, 331 F.3d at 760.

## B.      Standard for Reviewing SSA's Decision

My review is limited to determining whether SSA applied the correct legal
standards and whether its decision is supported by substantial evidence in the
record.  *Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003).  With regard
to the law, reversal may be appropriate when SSA either applies an incorrect legal
standard or fails to demonstrate reliance on the correct legal standards.  *See*
*Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).  With regard to the
evidence, I must "determine whether the findings of fact . . . are based upon
substantial evidence, and inferences reasonably drawn therefrom.  If they are so
supported, they are conclusive upon the reviewing court and may not be disturbed."

*Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). I may not reweigh the evidence or substitute my judgment for that of the ALJ. *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991).

### III. The ALJ's Decision

The ALJ followed the five-step analysis outlined above. At step one, the ALJ found that Mr. Becker had not engaged in substantial gainful activity from his alleged onset date of July 13, 2005, and met the insured requirements of the Social Security Act through December 31, 2006. AR 857. At step two, the ALJ found Mr. Becker had one severe impairment during the relevant period (July 13, 2005, through November 11, 2008): right clavicle pain. AR 857. At step three, the ALJ concluded that Mr. Becker's impairments did not meet or equal any of the "listed impairments" that mandate a conclusive finding of disability under the social security regulations. AR 858–60. At step four, the ALJ found that Mr. Becker had the following RFC during the relevant period:

> [T]he claimant had the residual functional capacity to perform a medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant cannot climb ladders, have no work on uneven ground/surfaces, and as a

> precaution, should avoid concentrated exposure to
> pulmonary irritants.

AR 860. The ALJ determined that during the relevant period, Mr. Becker could

return to his past relevant work as a customer service representative, an order

clerk, or a shipping clerk. AR 866–67. The ALJ accordingly concluded that Mr.

Becker was not disabled under the Social Security Act during the relevant period.

AR 869.

## IV. Analysis

### A. Relevant Evidence

Before addressing Mr. Becker's substantive arguments, I first clarify the

scope of the evidence I will consider in addressing them. Mr. Becker has already

been awarded benefits beginning November 11, 2008. The relevant issue here is

whether he is entitled to benefits from July 13, 2005, through November 10, 2008.

Because that is the time frame relevant for my review, I only consider evidence that

bears on Mr. Becker's impairments during that period.

Throughout his opening brief, Mr. Becker cites evidence from before and after

that period. I consider that evidence only to the extent that it relates to Mr.

Becker's impairments from July 13, 2005, through November 10, 2008. *See*

*Hendron v. Colvin*, 767 F.3d 951, 957 (10th Cir. 2014) (refusing to remand case for

consideration of evidence from outside the relevant period where claimant did "not

indicate how these records are relevant to the ALJ's determination whether she was

disabled during the Relevant Time Period"); *Pyland v. Apfel*, 149 F3d 873, 878 (8th

Cir. 1998) (explaining that a finding of disability based solely upon evidence outside

the relevant time period "would be contrary to the Social Security Act, 42 U.S.C. §§ 416(i), 423(c), which requires proof of disability during the time for which it is claimed").

## B.    RFC

Mr. Becker argues the ALJ erred in assessing his RFC because she failed to consider all his impairments, improperly evaluated several of the impairments she did consider, improperly weighed a rehabilitation report that described his work performance over two days, and wrongly weighed the various medical opinions.

RFC represents "the most [the claimant] can still do despite [her] limitations," 20 C.F.R. § 404.1545(a)(1), and must include "all of [the claimant's] medically determinable impairments," *id.* § 404.1545(a)(2). An RFC determination is an administrative assessment based on all the evidence of how the claimant's impairments and related symptoms affect his or her ability to perform work-related activities. *Young v. Barnhart*, 146 Fed. App'x 952, 955 (10th Cir. 2005) (unpublished). The final responsibility for determining the claimant's RFC rests with the Commissioner and is based upon all the evidence in the record. *Id.*; *see also* Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P 1996 WL 374184, at *7 (S.S.A. July 2, 1996) (indicating that the RFC assessment by the ALJ must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence).

1.     **Failure to Consider Certain Impairments**

Mr. Becker argues that the ALJ erred in her RFC assessment by failing to consider all of his impairments. Specifically, he argues that the ALJ failed to completely follow Judge Martinez's direction from the 2013 remand order to consider and address various diagnosed impairments. (*See* Pl. Br. at 19–20 & n.2, ECF No. 14.) While Mr. Becker concedes the ALJ addressed most of the impairments from the remand order, he argues the ALJ failed to consider tinnitus and narcolepsy/daytime somnolence. *Id.*

"Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989). The mandate rule requires a lower court to "comply strictly with the mandate rendered by the reviewing court." *Huffman v. Saul Holdings Ltd. P'ship*, 262 F.3d 1128, 1132 (10th Cir. 2001). However, as with other legal errors, deviation from the mandate is subject to harmless error analysis. *See Medina v. Astrue*, 847 F. Supp. 2d 1314, 1320 (D. Colo. 2012) (discussing whether ALJ's error in failing to follow mandate was harmless).

The ALJ deviated from Judge Martinez's order somewhat by failing to adequately discuss tinnitus or narcolepsy. However, in light of the scant evidence of these impairments, I conclude any error was harmless. *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (explaining that harmless error analysis "may be appropriate to supply a missing dispositive finding . . . where, based on material the

ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way"); *see also Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (requiring ALJ to discuss only "*significantly probative* evidence he rejects" (emphasis added)).

First, Mr. Becker fails to point to any evidence he was actually diagnosed with narcolepsy during the relevant time period. Rather, he cites to a different ALJ's decision from 2005, which rejected a 2003 narcolepsy diagnosis as unsupported. (Pl. Br. at 20, ECF No. 14 (citing AR 114)). The only evidence from the relevant time period is a 2006 insomnia diagnosis and Mr. Becker's contemporaneous complaints about fatigue. AR 341–43. As Mr. Becker concedes, the ALJ discussed Mr. Becker's reports of difficulty sleeping, noting that he was able to compensate by taking naps during the day. AR 863. Accordingly, the ALJ's failure to specifically address narcolepsy was harmless. *See Allen*, 357 F.3d at 1145; *Clifton*, 79 F.3d at 1010.

Second, the medical records do not suggest any functional impairment related to tinnitus. Dr. Gibbons diagnosed Mr. Becker with right ear tinnitus in 2007 but observed that Mr. Becker "speaks and hears in normal conversational tones." AR 384. Similarly, an August 2008 report from a different physician reported Mr. Becker "rarely or never misunderstands words." AR 1180. While Mr. Becker reported that he "misses words," especially in noisy environments, AR 278, this observation is insufficient to establish any functional impairment, particularly

in light of the physicians' observations to the contrary. Similarly, while an agency employee observed that Mr. Becker once had trouble hearing at a meeting, AR 243, this lay observation does not establish functional impairment. In fact, Mr. Becker points to no evidence that his tinnitus impacted his ability to work except Dr. O'Donnell's conclusion that Mr. Becker's tinnitus could cause concentration problems. AR 486-87. In light of objective testing during the relevant time period showing no impaired concentration, AR 379, and the ALJ's reasonable decision to give little weight to Dr. O'Donnell's conclusions (described in more detail below), any error in failing to discuss the tinnitus diagnosis was harmless. *See Allen*, 357 F.3d at 1145; *Clifton*, 79 F.3d at 1010.

### 2. Consideration of Other Impairments

Mr. Becker also argues that the ALJ improperly evaluated several of the potential impairments she did consider, including chronic fatigue syndrome, bilateral carpel tunnel syndrome, degenerative disc disease, and degenerative joint disease. For each of these impairments, Mr. Becker essentially asks me to improperly reweigh the evidence the ALJ adequately considered. *See Casias*, 933 F.2d at 800 (explaining that reviewing judge should not reweigh the evidence of substitute his judgment for the ALJ's). Nothing he points to suggests the ALJ overlooked relevant evidence, impermissibly discounted it, or applied the wrong legal standards. *Williamson*, 350 F.3d at 1098 (observing that review in social security appeals is limited to whether SSA's decision applied the correct legal standards and is supported by substantial evidence).

The ALJ permissibly relied on Dr. Genest's opinion that no objective evidence supported a chronic fatigue syndrome diagnosis. AR 864 (giving great weight to Dr. Genest's testimony, which included his statement that he saw "little objective evidence" of chronic fatigue syndrome). While Mr. Becker argues Dr. Genest's opinion regarding chronic fatigue "diverged" from those of Drs. Jones and Gibbons, even a cursory review of the various opinions shows no material differences. None of the three doctors endorsed chronic fatigue. Dr. Gibbons found no objective evidence suggesting *any* physical impairment. AR 385. Dr. Jones did not evaluate Mr. Becker's physical impairments at all, AR 380, so his conclusions plainly cannot contradict Dr. Genest's opinion regarding chronic fatigue syndrome.

As for the carpel tunnel diagnosis, the ALJ permissibly relied on Dr. Gibbons's conclusion that despite the diagnosis, Mr. Becker did not have any limitations in reaching, handling, feeling, grasping, or fingering. AR 863. Mr. Becker again argues that Dr. Genest's assessment differed from Dr. Gibbons's, but neither doctor endorsed any impairments related to carpel tunnel. Somewhat cryptically, Mr. Becker also argues there was a "failure to develop the record" because Dr. Genest did not know whether Mr. Becker had positive Tinel's test (a test for carpel tunnel syndrome). (Pl. Br. at 22, ECF No. 14.) However, Dr. Gibbons knew about the positive test—it was the basis for his carpel tunnel diagnosis—and nevertheless found no impairment related to it. AR 384–85. Moreover, Dr. Gibbons's conclusion is consistent with Mr. Becker's statement that he was able to accomplish all activities of daily living. AR 384. The ALJ thus permissibly relied

on Dr. Gibbon's opinion and Mr. Becker's statement to determine whether the carpel tunnel impacted Mr. Becker's ability to work.

Similarly, the ALJ considered both degenerative disc disease and degenerative joint disease, weighing the objective evidence as well as Mr. Becker's subjective complaints. In light of this evidence, the ALJ limited Mr. Becker to medium work with some additional restrictions on climbing and working on uneven ground. AR 860–66. Notably, the limitation to medium work was based on Dr. Genest's testimony that *if* Mr. Becker's mild spinal degenerative disease was more serious, he may want to limit lifting to 50 pounds. *See* AR 611. Additionally, the ALJ adopted a limitation on climbing and working on uneven ground, AR 860, even though Dr. Genest testified that a knee brace would eliminate any restrictions, AR 611. Thus, the ALJ favored Mr. Becker by adopting even the potential limitations Dr. Genest identified.

I also find unpersuasive Mr. Becker's argument that the ALJ failed to consider Dr. Frommelt's opinion. Dr. Frommelt opined that Mr. Becker had mild difficulties in maintaining concentration, persistence, or pace, but he also concluded that Mr. Becker did not have any severe impairments and observed his memory and concentration were "good" during the mental status exam. AR 399, 401. Mr. Becker's suggestion that he could not do skilled work because of this "mild" impairment is simply not borne out in the record, which includes objective testing showing no impairment in concentration. AR 379.

Mostly in passing, Mr. Becker points out various additional diagnoses and

15

summarily argues the ALJ erred in her consideration of them. Mr. Becker appears to conflate a diagnosis with impairment, basically arguing that because a doctor diagnosed a certain condition, impairment necessarily follows. Mr. Becker's flawed and conclusory arguments cannot withstand scrutiny.

In short, Mr. Becker asks me to second guess the ALJ's decision and substitute my judgment for hers. While his arguments demonstrate that perhaps the ALJ *could* have permissibly came to a different conclusion for certain diagnoses, they fall far short of showing the ALJ's RFC determination lacked substantial evidence. *See Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) ("We review only the *sufficiency* of the evidence, not its weight . . . .").

### 3. Rehabilitation Report

Mr. Becker's argument regarding the rehabilitation report fares no better. Once again, Mr. Becker takes issue with the ALJ's conclusion without identifying any basis for reversal. The ALJ adequately discussed the report, which reflected Mr. Becker's work at Goodwill over two days in 2005. AR 294, 864. The ALJ gave the report little weight because it was based on a short period of work, lacked any detail about the work he performed, and deferred too much to Mr. Becker's subjective complaints. AR 864. These are valid reasons for discounting the report, and they show that the ALJ adequately considered the report when she evaluated Mr. Becker's RFC.

### 4. Opinion Evidence

In a related argument, Mr. Becker argues the ALJ's RFC determination was

flawed because she failed to consider some opinions from outside the relevant period, improperly considered the opinions of Dr. O'Donnell, Mr. Becker's treating physician, and ignored other medical opinion evidence.

The amount of deference due to an opinion about a claimant's impairments varies depending on its source. An ALJ should "[g]enerally . . . give more weight to opinions from [a claimant's] treating sources." 20 C.F.R. § 404.1527(c)(2). In deciding how much weight to give a treating source opinion, an ALJ must complete a two-step inquiry. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). An ALJ must first determine whether the opinion qualifies for "controlling weight." *Id.* An opinion from a treating source is entitled to controlling weight if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and consistent with other substantial evidence in the record. *See* Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions, SSR 96-2P, 1996 WL 374188, at *1 (S.S.A. July 2, 1996). Even if not entitled to controlling weight, a treating source's opinion "may still be entitled to deference." *Id.* The amount of deference due depends on weighing several factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ uses these same factors to analyze

opinions from examining and consulting medical sources. §§ 404.1527(c),

416.927(c). "It is the ALJ's duty to give consideration to all the medical opinions in

the record. [Sh]e must also discuss the weight [s]he assigns to such opinions."

*Keyes–Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citation omitted).

An ALJ may dismiss or discount an opinion from a medical source only if she

provides "specific, legitimate reasons" for the rejection. *Chapo v. Astrue*, 682 F.3d

1285, 1291 (10th Cir. 2012).

I can quickly dismiss Mr. Becker's first argument—that the ALJ erred by

failing to consider opinions outside the relevant period—because the ALJ explained

that she considered opinions from outside the relevant time period but reasonably

gave them little weight. AR 866. Mr. Becker's arguments suggesting the ALJ

should have given more weight to opinions outside the relevant time period,

including one from five years before the relevant period, falls flat.

As for Dr. O'Donnell's opinions, the ALJ's discussion is admittedly brief, and

ALJ did not explicitly discuss a November 2008 opinion. But the ALJ did discuss

and reject Dr. O'Donnell's November 2011 opinion, which "reaffirmed" the 2008

opinion. AR 865. And the ALJ gave great weight to the opinions of Drs. Genest and

Gibbons, both of whom concluded that no objective evidence supported the

restrictions Dr. O'Donnell endorsed. AR 863–64. While the ALJ could have been

more explicit in her discussion of Dr. O'Donnell's 2008 opinion, her explicit rejection

of the 2011 opinion, together with the weight she gave to the opinions of Drs.

Genest and Gibbons, was an implicit rejection of the 2008 opinion. *See Groberg v.*

*Astrue*, 505 F. App'x 763, 766 n.1 (10th Cir. 2012) (unpublished) (holding that an ALJ's decision should not be reversed if "other reasoning already contained explicitly or implicitly in his decision supplied sufficient grounds for affirmance").

Moreover, I need only look to an earlier decision in the tangled and long history of this case for a more comprehensive explanation of why Dr. O'Donnell's opinions were given little weight. In the 2012 decision (which was ultimately reversed by Judge Martinez on other grounds), a different ALJ explicitly rejected Dr. O'Donnell's opinions as inconsistent with the objective evidence, his own treatment notes, and Mr. Becker's activities during the relevant period, which included using a drill for home repairs. AR 19. The ALJ also pointed out that Dr. O'Donnell's conclusion that Mr. Becker was disabled since 1999 was belied by his work history, which included full–time work in 2000, 2001, 2002, and 2003. *Id.* The ALJ's earlier reasons for rejecting Dr. O'Donnell's opinions confirm that any error was harmless *Cf. Groberg*, 505 F. App'x at 766 n.1.

Mr. Becker also points to various imaging reports and tries to cast them as opinion evidence. (Pl. Br. at 26, ECF No. 14.) These imaging reports, some of which are from outside the relevant period, do not undermine the ALJ's RFC determination, nor do they qualify as opinion evidence. 20 C.F.R. § 404.1527(a) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). The ALJ considered imaging reports

and, in conjunction with the other evidence, concluded they supported limiting Mr. Becker to medium work with some additional restrictions. AR 860–66. Moreover, while Mr. Becker points out that the imagining reports exist, he fails to explain why they should have altered the ALJ's determination.

In sum, the ALJ reached her RFC determination by appropriately considering and weighing all the relevant evidence, including the opinion evidence.

## C.    Assessment of Mr. Becker's Subjective Complaints.

Mr. Becker also challenges the ALJ's assessment of his subjective reports of pain. The ALJ concluded that Mr. Becker's subjective complaints were only partially credible. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013) (quotation omitted).

Much of Mr. Becker's argument regarding credibility rehashes the arguments I already rejected regarding the ALJ's assessment of the medical evidence. He also appears to argue that the ALJ's determination that Mr. Becker only had one severe impairment somehow led to a faulty credibility assessment. Because I already concluded that the ALJ adequately considered the medical evidence, I reject any suggestion that a faulty assessment of the evidence resulted in a similarly faulty credibility assessment.

Additionally, the ALJ properly considered Mr. Becker's activities of daily living when she found him partially credible. *Klein v. Colvin*, 25 F. Supp. 3d 1338, 1343 (D. Colo. 2014) (noting that activities of daily living "bear on a plaintiff's credibility to the extent that the level of activity is in fact inconsistent with the claimed limitations" (quotation omitted)).  For instance, Mr. Becker said he quit his job because he couldn't work at a computer.  AR 866.  But he also said he regularly used his home computer.  *Id.*  While Mr. Becker testified he used a voice recognition program rather than typing, AR 888–89, he was still able to use the computer for reading and other activities.  Mr. Becker was also able to shop, do household chores, drive, and help take care of his elderly mother.  AR 866, 889–90.  The ALJ reasonably relied on these activities to find Mr. Becker's subjective complaints less than fully credible. *See Newbold*, 718 F.3d at 1267.

## D.    Past Relevant Work

Finally, Mr. Becker argues that because the ALJ's RFC was faulty, she wrongly concluded that Mr. Becker could return to his past relevant work.  Because I find no error with the ALJ's RFC determination, I also reject this argument.

## V.  Conclusion

For the above reasons, I **AFFIRM** the Commissioner's final order.

**Dated**: August __15__, 2017 in Denver, Colorado.

BY THE COURT:


s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE